2ws463
184 325.

# In the matter of Dr T. W. Dyott's Estate. Appeal.

In February 1836, the defendant, T. W. D., set up a banking establishment called the Manual Labour Bank, and gave to certain trustees a bond and warrant of attorney, reciting, among other things, that whereas T. W. D. has already, and is about to issue his certain promissory notes for the payment of divers sums of money on their being presented at his banking-house in the city of Philadelphia, according to the tenor and effect of said notes, now the condition is such, that if the above bounden T. W. D. shall at all times hereafter pay and discharge all and every the promissory notes made payable by him as aforesaid, then the said obligation to be void. *Held*, that it embraced all notes whatever in the nature of bank-notes, whether payable on demand or post-notes payable at any future period.

*Held*, also, that J. R., who in May 1837 took an assignment of it from the trustees, and in May 1838 re-assigned it to them, and after the execution of the bond, and before the re-assignment advanced a large sum of money to the obligor on an invoice of goods and glassware, as collateral security, which the obligor retained in his possession and sold in July 1837 to third persons, who removed and disposed of it, any negligence on the part of such obligor would not affect J. R., as between him and other creditors of the obligor, though it might be otherwise as between him and a surety.

A person may relinquish a collateral security given to him by his debtor without the consent of the other creditors of the debtor, and not thereby lose his resort against the debtor's property, though he might be liable to the debtor if the security was lost by his negligence.

Although such creditor be also a nominal trustee for the creditors of the debtor, that would not affect his claim against the trust estate, if he has not violated his duty as trustee.

Nor if such creditor afterwards take the bond of the original debtor, and another bond of two others as collateral security for his advances, and then release the latter, but with a stipulation that it should not affect the liability of the original obligor, is his claim against the trust fund affected.

But it is clear that when the money is advanced after the sale of the goods pledged, the claim of the advancing creditor is not affected by having parted with the goods.

Notes of a bank received as collateral security after such bank has suspended specie payments, but afterwards gone on for a time under a specific arrangement, are embraced by a bond given to secure the notes of the bank, if the creditors on notes issued before the suspension omitted to issue process of execution under the bond when forfeited, and gave no notice to receivers of notes afterwards issued.

Nor is it any objection that such notes were taken from the obligor as collateral

[In the matter of Dr T. W. Dyott's Estate.]

security for moneys advanced to the obligor after the suspension, if the transaction was *bona fide,* and for a debt fairly due.

Nor that it was done after the obligor had given bond to take the benefit of the insolvent act.

A creditor holding collateral security has a right to come in on the fund of his debtor chargeable with it, to the full amount of the notes received, provided it does not exceed his debt.

APPEAL from the District Court of the city and county of *Philadelphia.* In the action of *Ball* v. *Dyott and several others,* the real estate of the defendant Dr T. W. Dyott was sold by writs of *levari facias* and *venditioni exponas,* and an auditor was appointed by the District Court to distribute the proceeds, which were claimed by depositors, note-holders of the Manual Labour Bank established by the defendant in the city of Philadelphia, and by other claimants. The fund in court, after deducting liens and charges, amounted to $15,714.39.

The auditor reported that,

The claims upon this fund which have been presented to your auditor, are for deposits of money with the defendant, and on notes of the Manual Labour Bank, of which he was the proprietor, and appear to have originated as follows, to wit:

On the 2d of February 1836 the defendant commenced the business of a banker. He established a bank which he called the "Manual Labour Bank," and received money on deposit from various persons for a limited time, agreeing to pay the depositors a certain rate of interest. He also issued his promissory notes, which were called Manual Labour Bank Notes, and were intended to, and did circulate as bank-notes, payable at his "Banking-House."

As a security to the public against loss, either by depositing money with him, or by his failure to pay his notes, or both, the defendant, on the 11th day of May 1836, executed a bond to Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, for $500,000, conditioned for the payment and discharge of all and every the promissory notes, made payable by him at his banking-house in the city of Philadelphia, and also for the payment of all and every sum of money left and deposited with him at his said banking-house, upon demand made according to the tenor and effect of the said notes, and the terms and conditions of such deposits.

On the said 11th day of May 1836, judgment was entered in your honourable court upon the said bond, and this is the first unsatisfied judgment on record against the defendant.

On the 19th day of May 1837, the said Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, executed an assignment of the said bond to Jacob Ridgway, which assignment Mr Ridgway appears to have accepted.

On the 19th day of May 1838, the said Jacob Ridgway re-assigned the said bond to the said Stephen Simpson, Samuel S.

[In the matter of Dr T. W. Dyott's Estate.]

Sneyd, Peter Y. Calder, and John A. Rowe, but your auditor is not informed that this re-assignment was ever accepted.

A printed copy of the said bond, with the assignments, will be found annexed to this report, marked schedule D.

### SCHEDULE D.

Know all men by these presents, that I, Thomas W. Dyott, of the city of Philadelphia, Doctor of Medicine, am held and firmly bound unto Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, in the sum of $500,000, lawful money of the United States, to be paid to the said Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, their certain attorney, executors, administrators or assigns; to which payment well and truly to be made I do bind myself, my heirs, executors, and administrators firmly by these presents, sealed with my seal, dated the 9th day of May 1836.

Whereas the above bounden, Thomas W. Dyott, has already, and is about to issue his certain promissory notes for the payment of various sums of money on their being presented at his banking-house in the city of Philadelphia, according to the tenor and effect of the said notes. And has already, and is also about to receive and hold on deposit such sums of money as shall be left and deposited with him at his said banking-house, allowing and paying for the same such interest and on such terms and conditions as have already and shall hereafter be agreed on with the depositors thereof, and in default thereof execution to be issued and the real estate of the said Thomas W. Dyott to be forthwith sold, or so much thereof as shall be fully sufficient to pay and satisfy all such notes, deposits, and demands so outstanding and unpaid after demand duly made of the said Thomas W. Dyott, according to the tenor and effect of the said notes, and the terms and conditions of such deposits, and the proceeds of such sales to be applied to the payment of the said notes and deposits with interest as aforesaid, by the said Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, their certain Attorney, executors, administrators or assigns.

Now the condition of this obligation is such, that if the above bounden, Thomas W. Dyott, shall at all times hereafter, pay and discharge all and every the promissory notes made payable by him as aforesaid, and also pay over all and every sum of money deposited with him as aforesaid, according to the terms and conditions of such deposits, and shall in all respects fulfil all the agreements, terms, and conditions entered into by him touching or concerning the same, then, and in such case, this obligation to be null and void, otherwise to be and remain to and for the uses and purposes aforesaid in full force and effect.

　　　　　(Signed)　　　　T. W. DYOTT, [SEAL].

Sealed and delivered in the presence of, &c.

[In the matter of Dr T. W. Dyott's Estate.]

For a valuable consideration to us in hand paid by Jacob Ridgway, of the city of Philadelphia, we do assign, transfer, and set over unto the said Jacob Ridgway, his heirs, executors, administrators, and assigns, all the within named obligation, and the penalty therein mentioned, and all the moneys due and to grow due thereon, and all on the same terms and conditions as is herein fully expressed, to hold to the said Jacob Ridgway in trust for the uses and purposes within mentioned: and also the judgment entered in the District Court thereon, in the city and county of Philadelphia, No. 248, March 1836: In witness whereof we have hereunto set our hands and seals at Philadelphia, this 19th May 1837.

(Signed)      STEPHEN SIMPSON,    [SEAL].

                    SAML. S. SNEYD,    [SEAL].

                    P. Y. CALDER,    [SEAL].

                    JOHN A. ROWE,    [SEAL].

Sealed and delivered in presence of us, &c.

I hereby agree to the assignment of this bond, and the judgment entered thereon by the within named obligees to Jacob Ridgway.

Witness my hand this 19th May 1837.

(Signed)      T. W. DYOTT.

Witness present, &c.

For a valuable consideration to me in hand paid by Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, I do assign, transfer, and set over unto the said Stephen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe, their heirs, executors, administrators, and assigns, all the within named obligation and the penalty therein mentioned, and all the moneys due and to grow due thereon, and all on the same terms and conditions as therein expressed, to hold to the said Stephen, Samuel S., John Y., and John A., in trust for the uses and purposes therein mentioned: and also the judgment entered in the District Court thereon in the city and county of Philadelphia, No. 248, March 1836.

In witness whereof I have hereunto set my hand and seal at Philadelphia, this 11th of September 1838.

Without prejudice to me, or recourse,

(Signed)      J. RIDGWAY,    [SEAL].

Sealed and delivered in presence of, &c.

I hereby agree to the assignment of this bond and the judgment entered thereon, by the within named obligees and assigned to the said Jacob Ridgway, by the said Jacob Ridgway to Ste-

[In the matter of Dr T. W. Dyott's Estate.]

phen Simpson, Samuel S. Sneyd, Peter Y. Calder, and John A. Rowe.

Philadelphia, September 11, 1838.

　　　　　　　　　(Signed)　　　**T. W. Dyott,** [seal].

Witness present, &c.

The Manual Labour Bank (which is identified with the defendant) appears to have gone on prosperously until the 4th day of November 1837, when it suspended specie payments, and never afterwards fully resumed.

The testimony of Peter Y. Calder and John B. Dyott to this point, who were examined before your auditor, is annexed to this report, marked schedule E.

### SCHEDULE E.

Statements of Peter Y. Calder and Jno. B. Dyott, who were examined before the auditor 29th of July 1840.

Peter Y. Calder affirmed. I was a teller in the Manual Labour Bank. The first entry of deposits in the bank books was on the 2d of February 1836. The business of the bank commenced on that day. On the 4th of November 1837, the bank stopped payment. It never fully resumed after that date. But after that date Doct. Dyott made payments as far as he could accumulate funds.

Under the direction of Judge King, I counted the Manual Labour notes surrendered by Doct. Dyott. The statement in the auditor's possession with my signature is correct. The notes were under my control till counted by Mr Glentworth. I assisted Mr G. in counting them. They were counted by both of us.

John B. Dyott sworn. I was one of the firm of J. B. & C. W. Dyott. After the Manual Labour Bank broke in 1837, we redeemed a large quantity of the bills of the Manual Labour Bank in goods. We redeemed over $100,000 in glass-ware, drugs and other articles. They were brought to our store and so redeemed, because they could not be redeemed in the bank. In November, the 4th or 5th, the Manual Labour Bank broke.

I think all the notes held by Danl. Mann were given to him after the failure of the bank. They were given him as collateral security for any notes that he might discount. All the notes held by Danl. Mann have our endorsement. He holds now about $16,000 of those notes. They are the same notes on which he claimed before the auditor in our estate; under our assignment Danl. Mann signed a release. Samuel S. Sneyd is dead.

Examined by Mr Wheeler. The notes I have spoken of were given by Doct. Dyott, but were drawn by M. B. Dyott and endorsed by us. They will speak for themselves.

On the 5th day of December 1837, the defendant issued a "bulletin," announcing his future plan of operations, and subsequently

[In the matter of Dr T. W. Dyott's Estate.]

made new issues of Manual Labour Bank notes to a very large amount. The most of these notes were made payable one year after date, and are distinguished by the name of post notes. Some of them bear date as late as the month of September 1838.

A copy of the " bulletin" will be found annexed to this report, marked schedule F, and headed "*Final arrangement of business.*"

SCHEDULE F.

Manual Labour Bank, Dec. 5, 1837.

*Final Arrangement of Business.*

The following scale of progressive redemption of the bills of the Manual Labour Bank exceeding the denomination of 50 cents, is now submitted by the proprietor to the option of bill-holders, the interest on the sums deposited to date from the 4th of November 1837.

1. In the month of January he will receive his bills of the denomination of $1.00 on deposit, at legal interest, to be refunded to depositors at the following periods, and in the proportions here laid down: — ¼ of the sum deposited in January of this denomination to be drawn on the 10th of February, in 50 and 25 cent bills of this bank, which will be redeemed, if demanded, in five days from the time of payment; ¼ on the 15th of February, in like manner; ¼ on the 20th, in like manner; ¼ on the 28th, in like manner, and on the same conditions. The day of deposit to make no difference to bill-holders, as to preference of time in the refunding of their respective amounts.

2. In the month of February he will, in like manner, receive on deposit his bills of the denomination of $2.00, to be refunded at the same periods, and in the same proportions, in his bills of $1.00, 50 and 25 cents, on the 10th, 17th, 24th, and 31st of the following month, (March).

3. In the month of March he will, in like manner, receive on deposit his bills of $3.00, to be refunded at the same periods, and in the same proportions, in his bills of $2.00, $1.00, 50 and 25 cents on the 10th, 18th, 25th, and 30th of the following month, (April).

4. In the month of April he will, in like manner, receive on deposit his bills of $5.00, to be refunded at the same periods, and in the same proportion, in his bills of $3.00, $2.00, $1.00, 50 and 25 cents on the 10th, 18th, 25th, and 30th of the following month, (May).

5. In the month of May he will, in like manner, receive on deposit his bills of the denomination of $10.00, to be refunded at the same periods, and in the same proportion, in his bills of $5.00, $3.00, $2.00, $1.00, 50 and 25 cents on the 9th, 18th, 25th, and 30th, of the following month, (June).

N. B. In order to prevent mistakes, the bills issued to depositors and redeemable in five days from the period of payment, will con-

[In the matter of Dr T. W. Dyott's Estate.]

tain on their face the date of issue. The interest only to be allowed on bills issued prior to the 4th of November 1837.

It will be observed that all deposits, with this exception, will bear interest from the 4th of November 1837, up to the period of refunding them, on the respective proportions.

☞ As each denomination of his notes is redeemable prior to their repayment to depositors, it will be observed that the bills of the Manual Labour Bank become then equivalent to money, and in *five* days from the time of issue, are all redeemable and equal to current bank bills.

*₊* Depositors who do not draw their money on the respective days of its becoming due, will be considered as four months' depositors in the saving fund.

            (Signed)        T. W. Dyott, *Banker.*
Stephen Simpson, *Cashier.*

In the year 1838, at the December Term of the Court of Common Pleas of Philadelphia county, the defendant filed his petition to the said court, for the benefit of the insolvent laws of this commonwealth. And in the month of January, A. D. 1839, the Manual Labour Bank was finally closed.

Two classes of creditors were created by the banking operations of the defendant, namely:

    1st. The depositors.
    2d. The note-holders.

And these two classes are subdivided into

    Original creditors, and
    Subsequent creditors,

having reference to the 4th of November 1837, the date of the failure of the Manual Labour Bank.

*The original creditors,* include all depositors and note-holders whose claims upon the defendant accrued prior to the failure of the bank, in November 1837.

*The subsequent creditors,* comprehend all depositors and note-holders whose claims accrued subsequently to the failure of the bank, in the said month of November.

With regard to the rights of these parties to come upon the fund in court, several points have been made before your auditor.

William L. Hirst, Esq., on behalf of the original creditors, argued that the failure of the Manual Labour Bank, in November 1837, was a forfeiture of the bond: that the right of the original creditors to the whole of the security of the bond then became vested: and that the whole of the fund in court must go to the original creditors, because the bond was actually forfeited to their use before the *subsequent creditors* were created.

Your auditor differs with Mr Hirst upon this point, and is clearly of opinion that both classes of creditors are placed upon the same footing as regards the security.

[In the matter of Dr T. W. Dyott's Estate.]

It is undoubtedly true, that on the said 4th of November 1837, the defendant forfeited his right to any further stay of execution on the judgment entered upon the bond.   Any note-holder or depositor, by making the proper application to the trustee, might have caused the real estate of the defendant to be sold, or so much thereof as would have been necessary for the payment of the claims of all depositors and note-holders then existing, who had complied with the conditions of the bond.   No steps, however, appear to have been taken by the creditors at that time, to avail themselves of the means provided for their security.   The defendant was allowed to continue his banking operations; he made his own terms for the payment of his debts, as will be seen by the bulletin of the 5th of December 1837; and although unable to redeem the notes he had already issued, went on making new issues to a very large amount, without any interference, that your auditor has been informed of, either on the part of the creditors or their trustee.

Every new note that was issued, professed upon its face to be "secured in trust on real estate," precisely as notes of the original issue.   If there was no such security for those notes, or if, in other words, the bond had been forfeited, and the rights of the original creditors to the whole of the security had become vested, they should have made that fact known at the time.   By failing to do so, they were instrumental in misleading the public with regard both to the extent and the value of the security under the bond, and in propping up the credit of the Manual Labour Bank.

To give to the original creditors, under these circumstances, the exclusive benefit of the fund in court, would be to contravene directly a principle that has always been scrupulously upheld by our courts, and that is necessary to the legal vitality of almost every transaction of business.   That principle prohibits one from holding a *secret interest* in property which is the apparent right of another.   Thus, in relation to personal property, possession is regarded as the most notorious evidence of ownership, and no assignment of personal chattels is valid, without notice of the transaction; which notice, as a general rule, must be the actual transfer of the possession of the chattels to the purchaser.   And in the case of a confession of a judgment; it is no lien upon the real estate of the defendant, until notice of the judgment is given by placing it upon the record of a court.   In the sale of real estate, no innocent purchaser shall suffer by the negligence of another, who had obtained a prior conveyance from the same person, and omitted to have it recorded: the purpose of recording the conveyance is to give notice of the transaction.

In the case before us, there is a judgment upon the record, covering so much of the real estate of the defendant as was unencumbered when that judgment was entered.   It was given for the security of all persons, who, at a certain time, not ascertained

in the judgment or the bond upon which it was entered, should be depositors in the bank of the defendant, or holders of a certain description of his promissory notes, namely, such as were made payable at his banking-house, in the city of Philadelphia.

The *time* at which this security might be forfeited to the use of depositors and note-holders, could only be ascertained by the happening of a certain event.

And the *number of persons* who were to participate in the security, remained unlimited until that event actually occurred.

This was an event to occur to the depositors and note-holders themselves; and until *notice* given of its occurrence by those to whom it was to occur, it was not to be presumed that the event had happened.

If, then, until notice given, the number of persons entitled to the benefit of the security remained unlimited, it is clear that the number was not limited on the 4th of November 1837, no such notice having been given at that time.

And if the number was unlimited at that time, it is equally clear that the original creditors, being the creditors then existing, are not *exclusively* entitled to the fund in court.

Now the *subsequent creditors* were created before notice was given of the event alluded to; and consequently before there was any limit to the number entitled to participate in the security of the bond. Their rights are therefore concurrent with those of the original creditors, and your auditor has so regarded them in reporting distribution of the fund.

Another point was raised before your auditor in relation to the *post notes.*

C. Wheeler, Esq., argued that all the post notes of the Manual Labour Bank should be excluded in the distribution of the fund. That no such notes had been issued by the defendant when he executed the bond, and that the bond had reference only to notes of the same character as those which had already been issued.

A reference to the language of the bond, and to the notes themselves, will answer this objection. It will be found that no particular character of note is described, other than promissory notes, for the payment of money, made payable at the banking-house of the defendant.

If the bond be construed strictly, nearly all the small notes issued by the defendant, prior to the failure of the bank, must be excluded, and the post notes objected to by Mr Wheeler admitted. Because the principal part of the smaller denomination of notes are not *promissory notes for the payment of money;* they are for the payment of *bank notes only,* and the law does not recognise bank notes as money. Whereas, all of the post notes are legal promissory notes for the payment of money, and are made payable at the banking-house of the defendant.

But if the meaning of the parties is to be an index to the pro-

[In the matter of Dr T. W. Dyott's Estate.]

per construction of the bond, its language must be interpreted more liberally for the note-holders, and all the notes of the Manual Labour Bank which have been issued and received in good faith, must be allowed their due proportion of the fund. They all profess on their face to be alike secured by the bond, and there can be no doubt that the defendant intended they should be so secured.

Your auditor has placed all the notes on the same footing, allowing them a *pro rata* share of the fund, with the exception of $75,000 held by Jacob Ridgway, and presented, and $30,700 held and presented by Daniel Mann.

The statement of Mr Ridgway, made before the Insolvent Court, in the matter of the application of the defendant for the benefit of the insolvent laws, which was in evidence before your auditor, a copy of which is annexed to this report, marked schedule H, will explain the manner in which Mr Ridgway came to the possession of the notes, on which he now claims a proportion of the fund in court.

### SCHEDULE H.

Statement of Jacob Ridgway, made on affirmation before the Insolvent Court at Philadelphia, on the 25th of February 1839, in the matter of the application of Thomas W. Dyott, M. D., for the benefit of the insolvent laws:

" When Dr Dyott commenced banking, he owed me nothing except some notes discounted for him to a small amount: the notes were principally on New York which I discounted. The amount advanced to him in 1836, was $8175.91, for notes discounted on New York; the first item of which was on the 15th July 1836; at that time, say 1836, he might have been indebted to me $4000 to $5000 for money lent. The loan of money commenced in February 1837: in 1837 I loaned to Dr Dyott $50,239.08 in cash upon a deposit of glass-ware and other goods to the amount of $93,829.28 per invoice, which was assigned and set over to Jacob Ridgway, on the 7th of April 1837, as a collateral security for money advanced, or to be advanced. In addition, I required that Dr Dyott should have the goods insured, which was done in two policies of $21,000, say $42,000, which were assigned over to J. Ridgway on the 14th of April 1837. Jacob Ridgway advanced a further sum, in 1838, of $49,460, all in cash, bottomed on the same security, making about $100,000 in the two years, and received on account of $18,275 for notes collected by T. Craven. I cannot tell what became of the goods lodged as a collateral security; I never got, directly or indirectly, one cent's worth of them; he, Dr Dyott, had the keys of the stores in which they were, as he had other goods in the same stores. I do not know where they are, or went to: I have understood they were sold, or turned over

with other goods to his son and nephew, but I never got any part of them. I received also as collateral, three packages of Manual Labour notes, one on the 6th of May 1837, $25,000; in the same month, one of $10,000, and one on the 10th of September 1838, $40,000—in all $75,000. I have those notes now. I never opened those packages, but suppose they contain the amount alleged, and I gave receipts for them in accordance, and which packages were to remain in my fire-proof at his risk. When I discovered that the goods had been turned over to his son and nephew, and that I could not get hold of them, I then insisted that Dr Dyott should give a joint bond with his son and nephew, J. and C. Dyott. Accordingly one was given on the 1st of February 1838, for $45,594.85, executed by Dr Dyott, John B. Dyott, and Charles W. Dyott: another was given on the 20th of May 1838, for $13,879.67 by the same parties, dated 20th of May 1838, both payable one year after date. I also purchased of Dr Dyott on the 4th of September 1838, a judgment of H. B. Pennock's for $5000, and gave him a check on the Bank of Pennsylvania for that sum to his order. I also, at the earnest solicitation of Dr Dyott, took an assignment of a mortgage of Ball's on the glass-works property; the mortgage had been sued out and the property sold by Ball and purchased by young Dyott, who could not pay for it; the sale was annulled, and the mortgage was assigned to me, when I paid to C. E. Lex, the attorney, $5354, (the receipt and check produced in court). When I took the goods as a collateral, I took his bond and warrant, dated 6th of April 1837, for $40,000, conditioned for the payment of such money as I might advance to him; the bond was entered up in the Supreme Court. I also took three notes, one of M. B. Dyott, of 24th of July 1837, endorsed by J. B. and C. W. Dyott and T. W. Dyott, at four months, for $2000; one other, dated 2d of August 1838, drawn and endorsed by the same, for $2000; and one other drawn by J. B. and C. W. Dyott, dated 16th of August 1838, for $2000, endorsed by T. W. Dyott. The endorsers requested that the notes should not be protested, and a writing to hold themselves responsible was drawn and signed. The three notes were not discounted; he had got a part of the money before and some afterwards; he, Dr T. W. Dyott, owes me now $66,000, being cash loaned to him. As it has been stated that I was in the habit of going to Dyott's drug-store next to his bank, three or four times a week, I here request to distinctly state that I was not in the drug-store more than eight times during the whole course of Dyott's business as a banker, and only once in his banking-house, and that time at his particular request. As far as my knowledge goes, there is $16,000 mortgage on the forty houses in Kensington, and $15,000 on the glass-works, beside the Ball mortgage before mentioned. I have no knowledge of searches being made when the $500,000 judgment bond was given; none were made when I took

[In the matter of Dr T. W. Dyott's Estate.]

the assignment. I kept an account in the Manual Labour Bank, to the amount of $5700; here is my bank-book showing the transaction, consisting of depositing small notes of other institutions in his bank, and drawing out his notes to pay away as they were more current at that time than any others, and ceased to do so when they became uncurrent. I have also, during that time, sent good money to the amount of $1000 to $2000 to be exchanged for his small notes, and sent small papers to specify the particular kind of notes I wanted; for those the money was either sent or paid to the Doctor when he called. I was not aware that my name was in the deposit books as trustee to his bank, until I heard it mentioned here. Dr Dyott signified for the first time to me that he was insolvent, the latter part of last year, and that he was not able to go on; before that he always said he had plenty of means to pay all his debts. In October 1837, I told Dr Dyott I did not think he had enough to pay all his debts : he replied that he had enough and plenty to pay every body, but only wanted assistance, and if he could get some money to pay off the claims pressing so hardly upon him, the shinplasters and deposit money, that things would go on well enough. My reply to this was that his credit was so much tarnished that nothing would restore the confidence of the public, short of paying the whole of the debts he owed. If he had a sum of money to-day, it would be exhausted immediately, and the pressure renewed, unless that sum was sufficient to pay all his debts; and as his credit was now gone, it was my opinion he had better wind up his affairs by turning all his movables and real estate into cash, and pay off the depositors and note-holders. He differed with me in opinion with regard to that policy, and replied if he could get a little money he could go on with credit to himself.

I told him he ought to know his own affairs best, but that I was still of the same opinion, that he ought to turn all his means into cash, and pay his creditors off, and if not enough to pay all, to pay as far as he could. He observed he was in danger of being mobbed if he stopped. I told him to pacify the minds of the public, to state to them what he meant to do, to stop and pay as far as he could—that would have the effect of quieting the public mind. This was about the amount of our conversation. He never distinctly stated his insolvency to me until he applied for the benefit of the insolvent law. He has been very cautious in stating to me his situation; he would communicate his wants, but not his inability to pay. I believe he was loth to let me know, as I have often predicted that matters would end as they have. He never entered into details of his means except once; he then told me that his brother and himself had entered into partnership with some one to build a steam-engine, which would yield him $100,000. He invited me to look at it. I did so, but was satisfied it would never do. I told him it would be a loss instead of

a gain; he said it had cost from 8 to $10,000, but I expect it cost much more; I told him that I apprehended my money had gone there, and if I had known it to be so, I would not have let him have it. I felt angry with him for entering into such an imprudent affair. He never gave me the particulars of his property. I never had possession of the property lodged and assigned as a collateral; it was so very bulky, that it could not well be removed, and I confided in Dr D.'s word and honour that he would not remove the goods without my consent; he had goods in the same warehouses. I have seen the goods while they were in the warehouses. I received a written notice to produce my accounts and vouchers in court, which are here before the court.

I signed the release of the young Dyotts, who have made an assignment, in order to obtain the dividend, as they got the goods which had been clandestinely taken from me. The lot adjoining to the glass-works has never been paid for by Dr D.; the price of the lot was to have been $3000. He has no title or claim to the lot; he gave his notes in October 1835, for the purchase money, which were renewed from time to time, and finally not paid. Half this lot belonged to Clayton Earl's estate; he gave his notes for $1500 to that estate, which I paid by lending the Doctor the money to do it with, and he gave me an order to Mr Miller and Mr Earl, the heirs of Clayton Earl, to make me the title for one half—the other half was mine. I do not wish to commit myself, or say anything wrong in regard to this lot. The property described in Ball's mortgage was sold twice. Dyott did not wish it sold, and said if it was separated from the other glass-works property, it would do great injury to that estate, and at his request and solicitation I bought the mortgage. The first sale by the sheriff was null; it was sold to a man who could not pay for it; the ten days had run out, and the money had to be raised. I sold it at sheriff's sale three months afterwards—it did me no good, but cost me attorney's fees to collect the money which I lost.

*Cross-examined by* Mr Phillips—It has been stated that money was put into your hands by Dr Dyott, to buy in his estate.

*Answer.*—I know of no means of Dr D. There never was any sum put into my hands to buy in his real estate, not to the amount of one single farthing, except what I have stated this day, on account of his debt. I always told him he vastly overrated the value of his property; that there were original mortgages on it, and it must be sold by the sheriff. He valued it at $200,000; I told him that I did not think any person would give him $50,000 for it, if he meant to pay for it. Dr D. did not give me $1000 as a bonus to hold the bond for $500,000, nor any other sum. I was prevailed on by Dr D., after much persuasion, to take the assignment of this bond. I was called on by Mr Simpson with Dr D., one evening at my office, and I believe the ostensible object of

their calling was to know if I would advance any more money. I inquired of them the amount of his debts, such as the amount of deposit money, small notes in circulation, and post notes. They said from 72 to $75,000 deposites, 2 to $3000 in small notes in circulation, and about $90,000 in post-notes. This was after things had become desperate; I asked Simpson how much money they wanted; he said if he had $30,000 he could go on; I said, here is a debt of about $170,000, and I could not see how he could get rid of that debt with $30,000; he said he would pay off the most pressing demands now bearing heavily on the bank; I said it would not last longer than one week, or two at the farthest; I asked where they could get the $30,000; they wished to know if I would give $20,000; I said I was deep enough in, and would go no farther, and it would only be the shifting the debt from one to the other, and told him I had no money to lend in that way. I do not recollect saying Dr Dyott was a fool for binding up his real estate. I never was consulted on the subject of the young Dyotts' debts, or about either of their failures; I know nothing of his checks or notes, except what has been here related by myself. The $5000 judgment of Pennock's, which I took of Dyott, was paid for in my check on the Bank of Pennsylvania, for $5000, drawn to Dyott's order, and by him endorsed when he received the money; it was not a special fund, as has been stated, to pay the Ball mortgage, but the money was paid as above stated, when the judgment of Pennock was assigned to me, and Dyott got every cent of the money; the judgment is due in July next, drawing interest. I know nothing of the way the young Dyotts carried on their business or their concerns, having been there so seldom. In 1836 I was in their counting-house twice; in 1837, three or four times, and in 1838 twice; not exceeding eight times in three years, and only once in the banking-room, which can scarcely be called so, as I did not go through it; I did not remain three minutes in the room; I never was behind the counter, or handled one cent's worth of money, or done any business of any kind whatever; I merely looked at the room, and passed out again; and when in the drug store or counting-house of the young Dyotts I did not remain from over one to fifteen minutes each time; I have never received one farthing of the payment on the bonds which I hold of the Dyotts, not even the interest; I do not believe I shall be caught again by such a bank.

The following original vouchers were produced and examined by the court:

1. An invoice of goods amounting to $93,899.25, which said goods were assigned and transferred by Dr Dyott to J. Ridgway, on the 7th of April 1837, as a collateral security for money he might advance; which said goods were afterwards sold and transferred by Dr Dyott to J. B. & C. W. Dyott, and by them removed

from the stores, without the knowledge or consent of J. Ridgway, by which he lost his lien on them.

2. Two policies of insurance for 21,000 each, say $42,000, on the above goods, which said two policies were assigned by Dr Dyott to J. Ridgway on the 14th of April 1837.

3. The original checks, drawn by J. Ridgway to Dr Dyott's order on the Bank of Pennsylvania, and paid to Dyott in the year 1837 — $50,239.

4. The original checks, drawn by the same to the same, and on the same bank, during the year 1838 — $49,460.

The amount of cash loaned and paid over to Dr Dyott in two years, - - - - - - - - - - - - - - - - - - - $99,699

From which is to be deducted,

| | |
|---|---:|
| A judgment against Pennock for - - - - - - - - | 5,000 |
| Mortgage assigned by Ball, - - - - - - - - - | 5,354 |
| Notes of hand collected and paid over, - - - - - | 18,275 |
| Note discounted, - - - - - - - - - - - - - | 5,600 |
| | $34,229 |

The securities which J. Ridgway holds for this balance are,

Dr Dyott and J. B. & C. W. Dyott's bond, dated 1st of February 1838, for - - - - - - - - - - - - - $45,594.85

Do.    do.    do.    20th of May 1838, for - - 13,879.67

Three notes of hand of the above parties for $2000 each, is - - - - - - - - - - - - - - - - 6,000.00

The amount actually due to J. Ridgway by the Dyotts, for which he has no other than the above obligation as security, - - - - - - - - - $65,474.52

Mr Randall, for Mr Ridgway, offered in evidence the two bonds of T. W. Dyott and J. B. & C. W. Dyott; also the three notes for $2000 each, all of which are referred to in the said statement.

Mr Randall further offered in evidence a copy of a note, dated 6th of May 1837, addressed to T. W. Dyott, by Jacob Ridgway; one dated September 10th, 1838, and one dated May ——, 1839, from the same to the same. These were objected to by Mr Hirst, and not received.

The invoice of glass-ware referred to in the said statement of Mr Ridgway, with the assignment thereof, was also in evidence before your auditor; a copy of the assignment will be found annexed hereto, marked schedule G.

### SCHEDULE G.

*Copy of the Assignment of the Glass-ware to Jacob Ridgway by Thomas W. Dyott.*

For value received, I do hereby assign, transfer, and set over, unto Jacob Ridgway, all the before-mentioned goods, wares,

[In the matter of Dr T. W. Dyott's Estate.]

merchandise, and glass-ware, stored and being in my stores, in a court on the east side of Second street, a short distance north of Arch street, back of Nos. 76, 78, and 80, mentioned in the aforesaid invoice, all my right, title, interest, claim, and demand in, and to the same, for his own proper use and benefit; being, however, intended to secure him from all losses, damages, or suffering, from or on account of moneys which he has advanced and paid over to me, or such sum or sums that he may hereafter advance and pay over to me, and to indemnify him from all losses on account of any and all notes, drafts, or endorsements of mine, which he may now hold, or hereafter hold, and not paid at maturity, and generally to save him harmless from all losses, damages, and inconvenience. In witness whereof, I have hereunto set my hand and seal, this seventh day of April, 1837.

(Signed)          T. W. DYOTT. [SEAL].

Witness, B. H. MOORE.

Remark.—The above assignment was written on an invoice of glass-ware, amounting to $93,899.23.

The policies of insurance referred to in the said statement, were likewise produced in evidence.

Mr Hirst, in objecting to the claim of Mr Ridgway, made the following points, to wit:—

1. The demand should be reduced from $75,000 to $66,000, that being the amount of the bonds.

2. The notes were given to Mr Ridgway as collateral to his private bonds, and $40,000 are dated September 10th, 1838, many months after both bonds are dated; and after Dyott's real estate had been advertised by the sheriff, and he had given bond to take the benefit of the insolvent laws.

3. Mr Ridgway, as trustee, was compelled to sue out execution when the bank broke, in November 1837: and by not so doing, if the holders of post-notes cut out the then existing creditors, he cannot claim now as against his *cestui que trusts.*

4. Mr Ridgway giving himself out as holder of a bond for $500,000, as capital of the bank, knowing it was not sufficient, cannot claim against his *cestui que trust.*

5. Mr Ridgway released J. B. & C. W. Dyott, and thereby released Dr Dyott, or at least his claim here, as against third persons.

6. Mr Ridgway having been trustee, could not accept the notes to secure a private debt.

7. The bond became forfeited on the 4th of November 1837, and no subsequent issues could devest the holders of existing debts.

Mr Randall in reply to Mr Hirst:—

1. The claim is not on the bonds given by T. W. Dyott, J. B. Dyott, and C. W. Dyott, to Mr Ridgway, but on the notes secured

[In the matter of Dr T. W. Dyott's Estate.]

by the bond and warrant of attorney of T. W. Dyott alone, dated 9th of May 1836, in the penal sum of $500,000, and entered up 11th of May 1836. If, however, the claim were based on the two bonds of T. W. Dyott *and others*, it would be no ground of diminution, inasmuch as the penal sum of those two bonds amount to $118,949.24.

2. It is immaterial when the notes were given, they are secured by and refer back to the judgment of $500,000; they are an additional security for a pre-existing debt. Any process that issued to sell the property of T. W. Dyott, before the delivery of these notes by T. W. Dyott to J. Ridgway, must have long since expired; and if they had not, it would not alter the rights of the parties.

3. Mr Ridgway was not compelled to sue out execution in November 1837.

(1.) No execution could issue without a writ of inquiry under the Statute of 8 & 9 W. 3, chap. 17. (See *Tidd's Practice* 508–9.)

(2.) No one of the *cestui que trusts* (creditors under the bond) demanded or required it.

(3.) Without such demand, specifically stating the debt, Mr Ridgway could not know for what sum, or in whose favour, to issue process.

(4.) There should have been exhibited to Mr Ridgway, legal evidence of the debt, and a tender of expenses.

(5.) Each *cestui que trust* could proceed on the judgment without the aid, consent, or interference of Mr Ridgway.

(6.) Mr Ridgway was not compelled to issue process at all: there might have been a dispute as to the debt, and he might have been made liable for damages, in case no sum was due, or a less sum was due than that demanded by the creditor at whose instance such process issued.

4. Mr Ridgway did not give himself out as the holder of a bond for $500,000, as capital of the bank, knowing it was not sufficient; there has never been produced the slightest evidence of this allegation. He accepted the assignment of the judgment, and nothing more. The judgment contains no statement of what property it bound. If Mr Ridgway has ever fraudulently recommended to any person or persons Dr Dyott's notes or bank, which is denied, and of which there is no evidence, he is respectively liable to such person or persons in unliquidated damages, to be determined by a court, with the aid of a jury or juries, and cannot be made liable in this manner to the whole body of creditors collectively in the aggregate amount of their debts.

5. At the time Mr Ridgway released J. B. & C. W. Dyott, a contemporaneous agreement was executed that such release should not affect or impair his claim on T. W. Dyott, which agreement has been given in evidence before the auditor. The note-holders

{In the matter of Dr T. W. Dyott's Estate.]

and depositors who claim as judgment creditors, are not third persons; they have no other or better rights in this case as against Mr Ridgway, than T. W. Dyott himself.

6. This is an assertion without any authority to sustain it; if it mean any thing, it is, that Dr Dyott was not bound to pay any debt he might contract with Mr Ridgway.

7. What is termed the forfeiture of the bond, could not impair the rights of subsequent parties, otherwise but *one cestui que trust* could ever be satisfied: viz. he who first make demand and produced default. One forfeiture of a bond is perfectly consistent with subsequent forfeitures, and has never been construed to bar the rights of subsequent claimants: in this case, the doctrine of priority of claim is not applicable, much less a claim for any antecedent holder or holders, in such a manner as to bar all others whose debts were subsequently contracted.

Mr Wheeler, (for G. W. Todd, a depositor,) in objecting to Mr Ridgway's claim, argued that Mr Ridgway had been paid by Dr Dyott to the extent of $90,000, according to the invoices of glass-ware which were assigned to him, with the policies of insurance. That there was no evidence to show why Mr Ridgway did not avail himself of that transfer; and that inasmuch as he had suffered the property to escape from him, he must consider his claim as having been fully satisfied.

Mr Randall, in reply to this, said that the property assigned had never been delivered to Mr Ridgway. The key of the store that contained it was retained by Dr Dyott, and the property was afterwards removed by Dyott, without the knowledge of Mr Ridgway. That the assignment of the goods was a mere nullity, inasmuch as possession did not follow it; and could not, therefore, affect the liability of Dyott to Ridgway, or the claim of Mr Ridgway in this case.

Upon this point your auditor is of opinion that although Mr Ridgway was not in the actual possession of the glass-ware assigned to him by the defendant, it cannot be said, that it was not under his control, and that he was not to all intents and purposes the owner of it. He considered it a sufficient security, for, according to his own statement, upon that security was bottomed the whole loan of money to Dr Dyott.

Mr Ridgway's position is this: He is first put in possession of, or has placed under his control, sufficient property to pay the amount of his claim against the defendant. He also received $35,000 of Manual Labour Bank notes, as a further collateral security for the same claim. He allows the first security to escape him, and afterwards receives an additional sum of Manual Labour Bank notes, amounting to $40,000—making in all $75,000. By resorting to the second security he diminishes, by $75,000, the only security which the other creditors under the bond can now look to, and which is already insufficient to indemnify them from

[In the matter of Dr T. W. Dyott's Estate.]

loss. Are the interests of third parties to suffer from Mr Ridgway's neglect to secure himself out of the property first placed under his control? Dr Dyott may be still liable to Jacob Ridgway, but the depositors and note-holders may reasonably consider the claim of Mr Ridgway satisfied; for by his own negligence the property transferred to him as a collateral security has been lost. Without recurring to the argument of Mr Hirst, this appears to your auditor to be a sufficient ground for excluding the claim of Mr Ridgway in this case.

The claim of Daniel Mann is upon $30,700, of notes of the, Manual Labour Bank, delivered to him in September 1838, by the defendant in the executions, as a collateral security for notes which Daniel Mann had discounted for the defendant.

Your auditor is of opinion that the bond was not given to secure the private debts contracted by Dr Dyott, as contradistinguished from such as were incurred by the receiving of deposits and the issuing of his bank-notes. This is manifest from the language of the bond itself, which refers particularly to deposits made and to be made, and to such notes only as were and *should be made payable at the banking-house of the defendant;* thus clearly distinguishing the Manual Labour Bank notes from his private business notes.

The debt due to Daniel Mann was not a bank debt, but a private debt, created by discounting the notes of Michael B. Dyott, with the endorsement of J. B. & C. W. Dyott. It was to secure this private debt that the notes now held by Daniel Mann were given him by the defendant, and that, too, at a time when a portion of the real estate of the defendant had been advertised for sale by the sheriff, and after he had filed his bond to take the benefit of the insolvent laws, and was notoriously in failing circumstances.

To allow this claim upon the fund, would, therefore, be recognising as proper and legal, a transaction which is not only inconsistent with the purport of the bond, but which amounts to a serious invasion of the rights of those who had received the notes of the Manual Labour Bank in good faith, and who had deposited their money with the defendant, under the belief that they were fully secured by the bond which purported to be for their benefit alone.

Daniel Mann's claim is therefore excluded.

*Recapitulation.*

Amount of funds for distribution . . . . . . . $15,714 39
Amount of dividend on deposits . . . $7256 38
"        "        notes . . . . 8458 01
                                        ―――――――
        Total . . . . . $15,714 39

[In the matter of Dr T. W. Dyott's Estate.]

The following depositions of T. W. Dyott were taken after the appeal and read without objection.

T. W. Dyott, a witness produced, affirmed and examined on the part of the defendant, doth depose and say:

I am sixty-nine years old and upwards. The debt of sixty-five thousand four hundred and seventy-four dollars and fifty-two cents, ($65,474.52), is justly and honestly due from me to Mr Ridgway. It was for money advanced at different times. No part of it was bonus or compensation of any kind. There were no dealings between Mr Ridgway and me but what were fair and honourable. I was frequently in want of money, and Mr Ridgway generally supplied me. Sometimes I have borrowed money from him for a few days by the exchange of checks; and when it got to a large amount, I had no means of paying him but by giving him bank-notes, Manual Labour notes, as a collateral security. While I was conducting this bank, I made a number of publications in the newspapers relative to the bank. I never consulted Mr Ridgway on the subject of these publications. They were not made by his knowledge or approbation.

Cross-examined by Wm. L. Hirst, Esq.

He became trustee at the date of the assignment of the bond to him of $500,000. One thing I should have related; that when Mr Ridgway knew that I had published his name as trustee, he came to me and asked me if I had; he said it was a very improper act to do without consulting him, and requested me to have the advertisements withdrawn; he seemed very much displeased about it. I told him I would order them to be withdrawn. He became trustee at my request. Upon no terms at all he became trustee, no further than I was then heavily indebted to him; and I told him I thought it would be as well for him to be trustee; and by urgent request he consented. I stated to him no object other than I have stated. My object was, if I had any, that being heavily indebted to Mr Ridgway he would have the power in his own hands more, and would be better able to conduct it than anybody else. I had no particular object in thinking that his name would give it additional credit. I believe the institution was in very good credit before as well as after. I neither believed nor disbelieved that his name would give it additional credit. I do not know that I gave it a thought. I never stated my business to any one. I always kept it to myself; of course I did not state to any one that his name would give credit to the institution. Most publications have some object of promoting the purposes of the business of which we speak. Do not think the publication was made with any object to obtain credit by the name of the trustee. No, it was not. It was for the purpose of making known the name of the trustee. I ordered the publication of the name of the trustee to be stopped the day that Mr Ridgway called on me. Some of the papers stopped it, and in some it was continued, I

suppose through neglect or otherwise. I do not recollect what papers it was published in now. It was not continued to be published for a year or more in some of the newspapers. Mr Ridgway did not afterwards consent to its being published. He never spoke to me again about it, after I said I would have it stopped. He told me he had not seen the publication, but he had heard of it, at the time he requested me to have it stopped. I do not know that he ever saw it. I owed him to the amount of what is stated, $65,000, at the time the bond was assigned to him. Perhaps I may be wrong; I do not know the amount at that time; I do not think I did owe him so much then. I cannot tell how much I then owed him. All I ever owed Mr Ridgway was for money borrowed and unpaid; and at the time the bond was assigned, whatever I owed him was for money due and unpaid. He had no security for the money at that time. I do not recollect whether he had asked for any. Money passed between us so often, that I cannot recollect. Mr Ridgway did loan me money after the bank stopped payment. November 1837, I gave him Manual Labour notes as collateral security. I do not recollect now whether I gave him any promissory notes or other security. He received from me checks as vouchers for money loaned. Due bills, not checks. It was due bills; generally for each loan. I do not know of any other vouchers than due bills. We have exchanged checks often for a few days; but that has no reference to this transaction.

Question. Did you, after your bank stopped payment in November 1837, publish a hand-bill inviting your creditors to call on Mr Ridgway, who would satisfy them of the solvency of the bank?

Answer. I have no recollection of it.

Quest. Did you, about the same time, address a crowd in front of your bank with same purpose, or in which Mr Ridgway's name was used? (Objected against by Mr Randall).

Ans. No, not to that purpose I did not. I did address them, stating that the conduct they were pursuing would be injurious to themselves, perhaps more than to me, if they pursued the course they were pursuing.

Quest. Were you in the habit of seeing Mr Ridgway and consulting him on the affairs of your bank after he became trustee?

Ans. I did not consult him on the affairs of the bank. I did not consult anybody but myself.

Re-examined by Josiah Randall, Esq.

Mr Ridgway did not receive one cent compensation for becoming trustee. I do not recollect whether some of these due bills were given up to me by Mr Ridgway. I never saw Mr Ridgway in the banking-house but once when it was in operation, and then I asked him to walk in and look at it, and he did.

(Signed)      T. W. DYOTT.

Solemnly affirmed and subscribed, November 20, 1841, before

(Signed)      JOHN BINNS, Alderman.

[In the matter of Dr T. W. Dyott's Estate.]

It is agreed that, in the above cases, the following questions may be put to T. W. Dyott, by John Binns, alderman, and the answers shall be considered as taken before the alderman at the time of taking the deposition.

Was the defendant, Jacob Ridgway, ever at your house or on your premises on any Sunday, at any time of the day during the period you lived in Second Street, or during the existence of the Manual Labour Bank?

How often during the said time was Mr Ridgway at your drug store; and was he ever there before 9 o'clock in the morning?

22d Nov. 1841.          (Signed)      W. L. HIRST, pro plaintiffs.
                        (Signed)      J. RANDALL, for defendants.

Quest. Was the defendant, Jacob Ridgway, ever at your house or on your premises on any Sunday, at any time of the day, during the period you lived in Second Street, or during the existence of the Manual Labour Bank?

Ans. He never was in my house in his life on a Sunday.

Quest. How often during the said time was Mr Ridgway at your drug store; and was he ever there before 9 o'clock in the morning?

Ans. During that time he may have been as often, but not oftener than six or eight times at my drug store, but never before 9 o'clock in the morning.

T. W. Dyott, being duly affirmed, doth declare and affirm—In the year 1838, I delivered to Daniel Mann a large amount of Manual Labour notes. The object was to secure him as collateral security for sums of money he had that year loaned to me at different times. He also held promissory notes; some of my brother's, some of my son's, some of my nephew's, and I believe, some of other people's; of that, however, I am not so certain. The money I thus obtained from Daniel Mann was applied to the payment and satisfaction of claims against the Manual Labour Bank, as far as it went; as I was at that time under the full assurance in my own mind that I should be able to weather the storm and to resume my usual business, for which I used every means in my power to obtain money in any way I could procure it to satisfy the demands of the bank. But after all, my friends became alarmed, as I suppose, and I was cut short of every resource, and was compelled, though very reluctantly, to resign to my fate. I had exhausted all the means I had; turned every thing into money, and borrowed as far as I could. I became then totally prostrated, and had nobody to assist me, so I gave up, and the business took its own course. The debt I incurred to Daniel Mann in 1838, was every dollar of it appropriated to the wants of the bank. I believe the amount of Manual Labour notes which I that year gave to Daniel Mann, for the purposes I have stated, was $30,700. When my son and nephew failed, I believe Daniel Mann had his claim upon their estate. I recollect no other

[In the matter of Dr T. W. Dyott's Estate.]

security than the above-mentioned Manual Labour notes, which I thought would be good security; unless there shall be something coming from the estate of Michael B. Dyott, of which it is evident there is nothing, nor will anything be recovered from the estate of Stanley & Moore, so far as I am able to judge.

T. W. DYOTT.

------

*Philadelphia, 6th of May* 1837.

DR. T. W. DYOTT.

Dear Sir,—I acknowledge to have received a package containing as you state (and as I believe, although I have not counted them), $25,000 in your notes issued in the form of your Bank Manual Labour notes. Those notes are to be held by me in my fire-proof (at your risk, my using all the necessary care for their safe keeping and preservation), as a collateral security for the payment of sundry sums of money which I have, or may hereafter advance, and pay over to you as a loan on interest, or for any notes of hand of yours, or by you endorsed, which I now do or may hold.

(Signed)　　　J. RIDGWAY.

$25,000.

------

*Philadelphia, May* 1837.

DR. T. W. DYOTT.

Dear Sir,—I acknowledge to have received a package containing, as you state (and as I believe, although I have not counted them), $10,000 in your notes, issued in the form of your Bank Manual Labour notes. Those notes are to be held by me in my fire-proof, at your risk (my using all necessary care for their safe keeping and preservation), as a collateral security for the payment of sundry sums of money which I have already or may hereafter advance and pay over to you as a loan on interest, or for any notes of hand of yours, or by you endorsed, which I now or may hereafter hold.

(Signed)　　　J. RIDGWAY.

$10,000.

------

*Philadelphia, 10th Sept.* 1838.

DR. T. W. DYOTT.

Dear Sir,—I acknowledge to have received a package of your Manual Labour Bank notes, which you state contains to the amount of $40,000, say $40,000 of said notes: not having counted them, I do not hold myself responsible for more than may be in said package. This package of notes is to be lodged in my fireproof at your risk, my using all due care for their preservation, and to hold as a collateral security for the payment of sundry sums of money, which I have loaned to you on your bond, notes,

. [In the matter of Dr T. W. Dyott's Estate.]

or endorsements, or that I may hereafter loan to you, and to be used, in case of need, at my option.

(Signed)          **J. Ridgway.**

$40,000.

Exceptions filed by Jacob Ridgway to the report of the auditor in the above case:

1. Because the auditor has rejected the claim of Jacob Ridgway as a creditor under the judgment, by virtue of which the auditor has distributed the fund in court.

2. Because the said Jacob Ridgway is entitled to receive the amount of his claim so far as the proceeds in court are to be distributed.

3. Because, if the bond and judgment for $500,000 are not a valid lien on the property of which the proceeds are in court, the said judgment being held void, still the said Jacob Ridgway would be entitled to claim the proceeds, by virtue of the judgment against the said T. W. Dyott, standing in his name.

*Additional Exceptions, filed* 26th *of December* 1840.

Additional exceptions filed by Jacob Ridgway to the report of the auditor:

1. Because the auditor has not appended to his report any certificate or list of judgments in the Supreme Court of Pennsylvania, Eastern District, against any of the individuals interested, or the defendant.

2. Because the auditor did not require of the different note-holders and depositors, the proof of the date when they respectively became creditors of the said T. W. Dyott.

3. Because the auditor has not appended to his report the proof of the said date.

4. Because the auditor has not stated or appended to his report, copies of letters given in evidence before him from Jacob Ridgway to Dr T. W. Dyott, dated the 6th day of May 1837, the      day of May 1837, and 10th day of September 1838.

Exceptions by Daniel Mann to the auditor's report:

Because the auditor has not allowed the claim of Daniel Mann in whole or in part.

On the auditor's statement of the evidence, it is manifest that this claim should have been allowed: for,

In September 1838, when Daniel Mann became the owner of the Manual Labour Bank notes, delivered to him by Dr Dyott, Dr Dyott followed no other business than that of a banker: the implication of law is, that if he borrowed money, it was for business connected with his bank.

Besides the implication of law—

. Peter Y. Calder says, in his statement, that after the 4th of

November 1837, Dr Dyott made payments as far as he could accumulate funds.

The fact is, that the $16,000 obtained from Daniel Mann, was obtained by Dr Dyott for the purpose of paying his bank creditors, and was so used by him.

Assignment of errors by Jacob Ridgway to the judgment of the court below in the above case:

1. Because the auditor and the court have rejected the claim of Jacob Ridgway as a creditor under the judgment, by virtue of which the court has distributed the fund in court.

2. Because the said Jacob Ridgway is entitled to recover the amount of his claim as far as the proceeds in court are to be distributed.

3. Because the auditor reported that Jacob Ridgway allowed the first security to escape him; and that therefore the other creditors may consider his claim as satisfied, and the court confirmed the report, whereas the statement of the fact is a misapprehension; and if it were correct, would not sanction the rule of law applied by the auditor to the case.

4. Because the court below decided that the notes held by Mr Ridgway were not received by him in the usual course of business. This statement of the fact is a misapprehension on the part of the court; and if it were sustained by the evidence, it would not warrant the conclusion of law drawn by the court from the said statement.

5. Because if the bond and judgment for $500,000 were not a valid lien on the property of which the proceeds are in court, on the ground that the said judgment was void, still the said Jacob Ridgway would be entitled to claim the proceeds by virtue of his own judgment in the Supreme Court of Pennsylvania, Eastern District, against the said T. W. Dyott.

6. Because the auditor has not appended to his report any certificate or list of judgments in the Supreme Court of Pennsylvania, Eastern District, against the defendant, or any of the individuals interested.

7. Because the auditor did not require of the different noteholders and depositors, proof of the dates when they respectively became creditors of the said T. W. Dyott.

8. Because the auditor has not appended to the report any proof of the said dates.

9. Because the auditor has not stated or appended to his report, copies of letters given in evidence before him, from Jacob Ridgway to Dr T. W. Dyott, dated the 26th of May 1837, the —— of May 1837, and the 10th of September 1838.

Specification of errors by Daniel Mann:

The auditor reported all the evidence that was before him on the subject of Mann's claim.

[In the matter of Dr T. W. Dyott's Estate.]

It was in evidence, that Daniel Mann furnished funds to Dr Dyott to enable him to meet his liabilities as a banker, on promissory notes drawn by M. B. Dyott, and endorsed by J. B. & C. W. Dyott, and Manual Labour notes being given by Dr Dyott to Daniel Mann.

To this evidence there was no contravening testimony; and besides, there was no opposition to the claim of Daniel Mann made before the auditor: of course, there was nothing to put him on his guard as to the danger of losing it—nothing to notify to him that further evidence to sustain it was requisite, or in any particular wanting.

The business of Dr Dyott, at the time of Daniel Mann's loan to him, was that of *a banker*, and nothing else: the presumption of law is, that any and all action in the borrowing of money, would be on account of his bank, and this rule of law is unanimously recognised by the Supreme Court, in *Mifflin* v. *Smith*, (17 *Serg. & Rawle* 169), where N. Smith, whilst carrying on speculations in his private capacity, was also a member of a partnership; and it was ruled, on the bald evidence of his borrowing money, to be enough to decide that the borrowing was for the partnership. At page 169, " It is the opinion of the court, that it is made on the faith and credit of the regular lumber business, in which he was engaged, and not on account of any speculation in which he may have been concerned on his own account. If a retail merchant gets a note discounted, is it not presumed to be in the regular course of his business? If a neighbour, who is in trade, borrows money of another, what is the presumption? Can it be presumed that he intends to buy a house?"

So much for the Supreme Court: it follows, that the District Court erred in adopting the error of the auditor.

There was no apology, no ground for a feigned issue before the auditor, because there was no resistance to this claim.

Error assigned by John Coffin:

Because the auditor and court erred in allowing holders of post-notes to come in for a share of the fund.

The appeal was argued by *Williams* and *Randall* for Ridgway, and *Wheeler* for Mann.

*S. H. Austin* for Coffin, and *Hirst* for depositors and note-holders.

The opinion of the Court was delivered by

Rogers, J. — Whether certain post-notes, issued by T. W. Dyott, are covered by the bond executed the 9th of May 1836, is the first question which it is necessary to determine. It is recited in the bond, among other things, "that whereas T. W. Dyott has already, and is about to issue his certain promissory notes for the

payment of divers sums of money, on their being presented at his banking-house in the city of Philadelphia, according to the tenor and effect of said notes, Now the condition, &c. is such, that if the above bounden Thomas W. Dyott shall at all times hereafter pay and discharge all and every the promissory notes made payable by him as aforesaid, then, &c. the obligation to be void." The words are studiously comprehensive, and may, without doing any violence to the language, embrace all notes whatever in the nature of bank-notes, whether payable on demand or at any future period. The intention of the obligor was to establish a regular banking establishment, to be conducted as other institutions of that kind; among which the issue of post-notes, as a medium of circulation, in latter times at least, was a frequent expedient. In order to give currency to the circulation of this, and other descriptions of paper, he pledges all his real estate, not before encumbered, for their redemption. As no apparent discrimination is made, the holders of post-notes, which differ from other promissory notes only as to the time of payment, had no reason to believe that there was or could be any distinction made between them, they took them on the general understanding that as no distinction was, in terms, made in the form of the instrument, there was no difference in the security. The obligor agrees to pay all the promissory notes issued by him according to their tenor and effect; and for this purpose he pledges, specifically, his real estate. A discrimination such as has been attempted would sound very ill in the mouth of the obligor; nor does *he* allege that any difference was intended; nor do we think that such a plea is any more available although made by persons who wish to come in on the fund raised by the sale of the real estate, to the exclusion of that class of creditors. There can be little doubt that Dr Dyott intended that all should be placed on the same footing; and his intention should have a controlling influence in the construction of the instrument, in a contest between his different creditors.

The claims of Jacob Ridgway and Captain Mann have been excluded by the auditor and by the court; and of this they complain. The 2d of February 1836, T. W. Dyott commenced business as a banker. He established a bank which he called the "Manual Labour Bank," received money from various persons for a limited time, and agreed to pay depositors, on certain terms, a fixed rate of interest. He also issued promissory notes, payable at his banking-house, called Manual Labour Bank Notes, which, for a time, circulated freely as bank-notes. As a security against loss by depositors or holders of his notes, Dr Dyott, on the 11th of May 1836, executed a bond to Stephen Simpson, and others, for $500,000, conditioned for the payment of the promissory notes made payable by him at his banking-house, &c. and also for the payment of every sum of money deposited with him at his bank-

II. — 62

[In the matter of Dr T. W. Dyott's Estate.]

ing-house, upon demand made, according to the tenor and effect of such notes, and the terms and conditions of such deposits. Judgment was entered on the bond on the 11th of May 1836, and on the 19th of May 1837, Stephen Simpson, and the other assignees, with the assent of the obligor, assigned the bond to Jacob Ridgway; and on the 19th of May 1838, the bond was re-assigned to Stephen Simpson, and the other assignees. After the execution of the bond, and before it was re-assigned, Jacob Ridgway advanced a large sum of money to Dr Dyott, who, on the 7th of April 1837, transferred to him an invoice of goods, consisting of glass-ware, &c. as a collateral security for money he had or might advance. These goods, in defiance of the pledge, were afterwards sold by Dr Dyott to J. B. and C. W. Dyott, and were removed by them from the place where they were stored without the knowledge and consent of Mr Ridgway. The fair import of the evidence is, that although the goods were not in the actual custody of Mr Ridgway, yet they were under his control; and if there was nothing else in the case, and this was a contest between him and a surety, it would be difficult to escape from the position in which his negligence has placed him. But this is a contest between . creditors, as to the distribution of a fund arising from the real estate of the debtor, and I cannot perceive how the facts stated can postpone, or in any manner affect his rights to a proportion of the money in court. A person may, if he chooses, relinquish a collateral security altogether, without the assent of other creditors of his debtor. It is matter resting entirely between him and his debtor, with which others have nothing to do, and of which they cannot complain. If the holder of a note chooses to release an endorser, it will not be pretended that it will discharge the maker. His claim remains in force as before; and where is the difference between a security by endorsement and a collateral security? for collateral securities stand in the place of a surety not entitled to indemnity. *Lewis* v. *Bank of Penn-Township*, (3 *Whart.* 537). A neglect to prosecute and secure a collateral security will not discharge the principal in a bond. *Ormsby* v. *Fortune* (16 *Serg. & Rawle* 303). If it will not, as this case shows, it is difficult to see why the creditors of the debtor should be suffered to complain of it. If a debtor should place in the hands of his creditor a collateral security which was injured or destroyed by the gross negligence of the creditor, the debtor would be entitled to indemnity, because there is a privity of contract; but here there is no privity between the other creditors and Mr Ridgway. He had an unquestionable right to permit any one of his securities to slip from him, without any regard to the interest of other creditors, of whose existence he may not have been aware. For an injury of this description Dr Dyott could alone complain; but he would come into court with a bad grace to complain of his own act. But Mr

[In the matter of Dr T. W. Dyott's Estate.]

Ridgway is not only a creditor, but a trustee, and for that reason, as is said, he stands in a peculiar situation. This is a position more plausible than sound. It is true, he is a trustee, but a naked trustee only. He had the legal title vested in him by force of the assignment, and suits must have been brought, during its continuance, in his name. But beyond this he has no further interest than any other creditor. No additional obligation is thrown upon him. The bond is for the benefit of each and every creditor embraced within its provisions, and suits may be brought on the bond by any one who may conceive himself aggrieved by the default by the obligor, in the name of the trustee, but for his own use. It is not the duty of the trustee to give his personal attention to the suit, as such, any more than it is the duty of the officers of the commonwealth, the Governor or the President Judges of the Orphans' Court, to attend to the collection of money for individuals on official bonds. As in the cases named, he is a mere organ, a conduit-pipe, by which depositors and holders of notes may have the benefit of the security. It is very true that trustees cannot take advantage of their own laches, and if Mr Ridgway had had any duty to perform in relation to this trust, he would not be permitted to manage it in such a way as to benefit himself at the expense of others, and this is the purport of the case of *Kentish* v. *Newman*, (1 *P. Wms.* 235); *French* v. *Hobson*, (9 *Vez.* 102). The forbearance of a trustee, as is said in *Lewin on Trusts and Trustees*, 655, on the authority of Sir Joseph Jekyll, in not doing what it was their office to have done, shall in no sort prejudice the *cestui que trust*, since, at that rate, it would be in the power of trustees, either by doing or delaying to do their duty, to affect the rights of other persons; which cannot be maintained. From this position no one will dissent. But this is as to the management of the trust. But what peculiar duty has Mr Ridgway to perform? He is placed on the same footing of other creditors, with the exception that his name must be used as a legal party to the bond. Beyond this I cannot imagine any thing he can do, except what is common to each and every creditor of the obligor who has claims under the bond. He must be regarded as a mere nominal instrument, without any discretion whatever; with the same power to contract with the obligor as before he confidentially consented to accept the assignment, and with the same, and no less power, that any other individual had to make contracts with him. We therefore see nothing to take this case out of the general rule.

After sale of the goods pledged, Mr Ridgway, who, with great cause, complained of the transaction, took bonds from J. B., C. W. Dyott, and T. W. Dyott, as a collateral security, for the latter, and afterwards released the two first, but with an agreement that the release should not affect or impair his claim against T. W. Dyott. This transaction comes within the same principles which have been already discussed. T. W. Dyott cannot com-

plain, as it was done with his privity and consent, and his creditors are in no better situation than he is.

It would seem, that after the sale of the goods pledged, and after the release of the Dyotts' bond, Mr Ridgway advanced the money which now constitutes his debt against T. W. Dyott, a fact which, if the case needed it, would be very material, but which would appear to have been wholly overlooked by the creditors.

But it is insisted that this claim cannot come upon the fund, because, 1st. Notes which are collateral were issued after the 4th of November 1837, when the bank suspended specie payments; and secondly, because the debt was a private debt of Dr Dyott, not connected with the business of the bank, and not in the usual course of business.

It must be premised that we have no evidence when any of the notes were issued, that being unnecessary to examine, as in the opinion of the auditor the date of the issue was immaterial. He placed them all on the same footing.

The first point assumes that there are two classes of creditors, original and subsequent creditors, viz., creditors before the 4th of November 1837, the time of the alleged failure, and creditors after that time. It is contended on behalf of the former, that the failure of the Manual Labour Bank in November 1837, was *ipso facto* a forfeiture of the bond; that the right of the existing creditors to the whole security of the bond immediately attached, and became a vested interest; that consequently, the whole fund must go to their use, inasmuch as the bond was forfeited before even the subsequent creditors were created. We dissent from this position, and agree with the auditor, that both classes, as to the security arising from the bond, are in the same category. It is true, that on the 4th of November 1837, the defendant forfeited his right to any further stay of execution on the judgment entered on the bond. After that period it would have been competent for any one or more of the creditors to issue a *scire facias* in the name of the trustee who held the legal title, to show cause why execution should not be had. In this manner, the real estate bound by the judgment, may have been sold, or as much thereof as would be required to pay the claim of depositors and note-holders then existing, who had complied with the conditions of the bond, and so *toties quoties*. If, after having taken this step, any property remained, it would have been liable for future issues. But this was a right which the creditors, if they thought proper, might waive either expressly or by unequivocal acts, and this it appears was in effect done. No steps were taken by them; they slept upon their rights, and, with the general consent of all, the defendant was allowed to continue his operations as a banker. Accordingly, we find him, after this catastrophe, of which mention has been made, issuing what has been termed a " bulletin," in which he proposes certain terms to his creditors, which were acquiesced in, at

least against which there appears to have been no manner of objection. Under the terms and conditions thus held out to the public generally, he made heavy issues of paper, obtained large loans, of which the claims in question form considerable items. It is a fair inference, from the evidence which addresses itself to the equity of the case, that by this means the obligor was enabled to raise large sums of money from Mr Ridgway and Capt. Mann, of which we have express proof; that part, at least, if not the whole, went to the payment of the debts of the original creditors, in whose behalf the objection is now made. There is nothing on the face of the notes, or in the terms of the bond, which would cause any person to apprehend any difficulty. No steps were taken which were in the least degree calculated to give notice of any vested right in any person, nor any thing said or done which would lead the unwary or unsuspecting to apprehend that any preference would be given to the holder of notes, according to the time of issue, which by the bye it would be impossible for the holder, in a majority of cases, to know, these notes being in a course of circulation as money, and the date of them being but little, if any, evidence when they were issued. The bond is given for the security of all persons, whether depositors or note-holders, without any discrimination as to the time of issue. It may be, that in this particular instance, Mr Ridgway and Capt. Mann knew the embarrassment of the bank, nay, it is very certain that they did, to their cost, but it was not known to them whether the existing creditors would or would not proceed to execution on the judgment. It has been said, that Mr Ridgway gave himself out as the holder of a bond for $500,000 as the capital, knowing that it was not sufficient. But there is nothing in the evidence which impugns, in the least, the entire good faith of either him or Capt. Mann. There seems to have been a degree of infatuation in both these sagacious men, for which it is somewhat difficult to account, but every thing appears fair, honest, and even liberal, as respects the defendant. Their object appears to have been, and particularly the former, to sustain the credit of the institution by the advance of means which went immediately to the use of the bank.

It is said that these were private debts, having no connexion with the business of the bank. The latter part of the proposition there is reason to doubt; but that they are private debts, not within the bond, is true, and, as such, they have no claim to the fund. But how does the case stand? Doct. Dyott, the defendant in the execution, is indebted to Mr Ridgway in a large sum of money, viz., $65,474.52, and being so indebted, as a collateral security for this fair and honest debt, he takes the bond of J. B. and C. W. Dyott and of T. W. Dyott, and three notes of hand from the same parties; and, for a further collateral, Doct. Dyott puts into the hands of his creditor notes of the Manual Labour Bank, at two several times, amounting in the whole to $75,000.

[In the matter of Dr T. W. Dyott's Estate.]

It must be remarked, that the claim to a proportion of the specific fund is not directly on the debt due by Doct. Dyott, although that claim is undoubtedly the foundation of the demand, but he claims his proportion by virtue of the collateral security, consisting of the notes of the bank, which were deposited with him for this very purpose. Why did Mr Ridgway consent to receive the notes as collateral? for the reason precisely that they were considered a better security than an ordinary note or bond of the same individual, because, in addition to the personal security of the debtor, he had already pledged his real estate for their redemption. Without this pledge, his situation would not be at all bettered or changed by the possession of the notes. It is said, however, not to have been in the usual course of business. If by this it is meant that it is not an every-day transaction, it may be admitted; but if this suggestion is to take, as a reason for destroying the claim, I cannot see the force of it. It is a legitimate business, having nothing unfair in it, and such as an honest, conscientious, and prudent man may well engage in. The bond and judgment give a lien to the holders of such notes, without regard to the manner they came into the possession of them, provided they came honestly by them. It is very certain that such a defence would not be listened to, if it came from the defendant, and I am at a loss to perceive in what respect the creditors are in any better situation. It is a question of intention on a fair construction of the instrument, and I cannot bring myself to doubt that this transaction comes fairly within its spirit, as it undoubtedly does within its letter. There is nothing in the evidence which evinces any intention of Mr Ridgway to waive any right on this collateral security. In enumerating his securities for his debts, at a time of some excitement, and no little persecution, he forgets to mention this as one of them. But this is evidently a mistake. The deposit of the notes was intended as a collateral and was received as such, as is apparent from the receipt of Mr Ridgway, which is in language which it is impossible to misunderstand. The amount of notes deposited as collateral was $75,000. Of this sum $40,000 was handed to him the 11th of September 1838, after the defendant gave bond to take the benefit of the Act, but before he filed his petition. This, we think, makes no difference, as we are of the opinion that the same reasons apply both to the $40,000 and the $35,000 advanced at an earlier date. Giving a bond to take the benefit of the Act does not deprive a debtor of an honest control of his property. He may contract debts afterwards, if fairly and honestly done, which will be entitled to be paid out of his property, nor will he be deprived of the liberty, if he chooses it, to prefer one creditor to another for the debt for which he was arrested. The bond is given by the person arrested to the plaintiff in the suit, conditioned, that he will appear at the next term, and then and there present his petition for the benefit of the Insolvent Laws, &c. The debtor

[In the matter of Dr T. W. Dyott's Estate.]

may appear or not, but the only consequence which results from his failure to comply is, that he and his sureties become liable on the bond to the plaintiff.

Having established the right to come in on the fund, the next inquiry is, to what extent? And it is very clear that he has a right to his proportion on the whole amount pledged, viz., $75,000, provided the amount of the dividend does not exceed his debt, viz., $65,474.52. The case of Capt. Mann stands on same footing of Ridgway.

Decree reversed, and fund distributed to the parties in certain proportions accordingly.